KYRA A. KAZANTZIS (STATE BAR NO. 154612)
kyrak@lawfoundation.org
JAMES F. ZAHRADKA (STATE BAR NO. 196822)
jamesz@lawfoundation.org
ANNETTE D. KIRKHAM (STATE BAR NO. 217958)
annettek@lawfoundation.org
JESSICA L. FRY (STATE BAR NO. 264480)
jessicaf@lawfoundation.org
FAIR HOUSING LAW PROJECT
LAW FOUNDATION OF SILICON VALLEY
152 North Third Street, Third Floor
San Jose, CA 95112
Telephone: (408) 280-2410
Facsimile: (408) 293-0106

Attorneys for Plaintiffs David and Barbara Watts

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAVID A. WATTS and BARBARA I. WATTS,<br><br>        Plaintiffs,<br><br>    v.<br><br>JP MORGAN CHASE BANK N.A.; CHASE HOME FINANCE, LLC; U.S. BANK, N.A.; CALIFORNIA RECONVEYANCE CORPORATION; and DOES 1-50,<br><br>        Defendants | Case No. C 11-02780 LHK<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT; CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT; AND CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200<br><br>DEMAND FOR JURY TRIAL |

## I.    INTRODUCTION

1.    With this lawsuit, David and Barbara Watts ("the Watts family") seek redress for violations of the federal Equal Credit Opportunity Act, California's Fair Employment and Housing Act, and California's Unfair Business Practices Act for

failing to (1) properly consider the income the Watts family received from California
State Disability Insurance in evaluating their eligibility for a Home Affordable
Modification Program ("HAMP") loan modification; (2) provide the Watts Family
with proper written notice regarding the specific reasons they were denied a HAMP
modification; and (3) follow the procedural safeguards set forth in California's non-
judicial foreclosure statutes.

## II.   JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§
1331 and 1337 based on Plaintiffs' claims under the Equal Credit Opportunity Act,
15 U.S.C. §1691(d).

3.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367
to hear and determine Plaintiffs' state law claims because those claims are related
to Plaintiffs' federal law claims and arise out of a common nucleus of related facts.
Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that
those claims form part of the same case or controversy under Article III of the
United States Constitution.

## III.   INTRADISTRICT ASSIGNMENT

4.      Venue is proper in the Northern District of California pursuant to 28
U.S.C. § 1391(b)(2) in that the unlawful conduct that gives rise to these claims
occurred within the Northern District of California.

5.      Intradistrict assignment in San Jose is proper since Plaintiffs reside in
Santa Clara County and the unlawful conduct that gives rise to these claims
occurred in Santa Clara County.

## IV.   THE PARTIES

6.      David Watts is a resident of Santa Clara County who has owned and
resided in his home located at 16890 Cabernet Court in Morgan Hill, California,
since April 2004.

7.     Mr. Watts has Lupus—a chronic autoimmune disorder—and has difficulty walking, requiring the use of a cane. As such, Mr. Watts is a handicapped person within the meaning of California Fair Employment and Housing Act, California Government Code section 12955.3.

8.     At the time of the allegations contained herein, Mr. Watts received monthly State Disability Insurance payments in the amount of $2,940.

9.     Barbara Watts is Plaintiff David Watts's wife and a resident of Santa Clara County who has owned and resided in her home located at 16890 Cabernet Court in Morgan Hill, California, since April 2004.

10.     The Watts family is informed and believes, and thereon alleges, that Defendant JP Morgan Chase, N.A. ("Chase") is a corporation organized and existing under the laws of the State of New York. Upon information and belief, Chase regularly conducts business in the State of California and the County of Santa Clara. The Watts family is informed and believes that Chase's business activity includes mortgage lending, mortgage servicing, and otherwise extending credit to persons in residential real estate matters.

11.     The Watts family is informed and believes that Chase Home Finance LLC, ("Chase Home Finance") is a limited liability company organized and existing under the laws of the State of Ohio. Upon information and belief, Chase Home Finance regularly conducts business in the State of California and the County of Santa Clara. The Watts family is informed and believes that Chase Home Finance's business activity includes mortgage lending, mortgage servicing and otherwise extending credit to persons in residential real estate matters.

12.     The Watts family is informed and believes, and thereon alleges, that U.S. Bank, N.A. ("U.S. Bank") is a corporation organized and existing under the laws of the State of Delaware. Upon information and belief, U.S. Bank regularly conducts business in the State of California and the County of Santa Clara. The Watts family is informed and believes that U.S. Bank is the current beneficiary, by

1  assignment, of the promissory note and the Deed of Trust which currently

2  encumbers the Watts family home.

3      13.     The Watts family is informed and believes, and thereon alleges, that

4  California Reconveyance Company is a corporation organized and existing under

5  the laws of the state of California.  Upon information and belief, California

6  Reconveyance Corporation regularly conducts business in the County of Santa

7  Clara.

8      14.     Plaintiffs are ignorant of the true names and capacities of defendants

9  sued herein as Does 1-50, and therefore sue these defendants by such fictitious

10 names.  Plaintiffs will amend this complaint to allege their true names and

11 capacities after they are ascertained.  Plaintiffs are informed and believe and

12 thereon allege that the fictitiously named defendants claim some right, title, estate

13 lien or interest in the property and that defendants' claims constitute a cloud on

14 plaintiffs' interest in the subject property.

15     15.     Plaintiffs are informed and believe that at all relevant times each

16 defendant was the agent or employee of each of the remaining defendants and, in

17 doing the things hereinafter alleged, was acting within the course and scope of such

18 agency and employment.

19                    V.     FACTUAL ALLEGATIONS

20              A.     The Making Home Affordable Program

21     16.     The United States Department of the Treasury ("Treasury")

22 established the Home Affordable Modification Program pursuant to the Emergency

23 Economic Stabilization Act of 2008 ("Economic Stabilization Act").  The Economic

24 Stabilization Act directed Treasury to use its authority to protect and preserve

25 homeownership.  The Economic Stabilization Act further directed Treasury to

26 implement a plan to maximize assistance to homeowners and encourage mortgage

27 servicers to minimize foreclosures.  In furtherance of these goals, Treasury, through

28 Fannie Mae, created HAMP and entered into agreements with loan servicers.  *See*

Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 101, 122 Stat, 3765 (October 3, 2008) ("EESA").

17.    HAMP's primary purpose is to assist homeowners in default or at imminent risk of default on their home mortgages "by establishing a standardized and streamlined process for servicers to follow in evaluating and conducting modifications of existing mortgages." Financial Stability Oversight Board, Quarterly Report to Congress Pursuant to § 104(g) of the Emergency Economic Stabilization Act of 2008, at 31 (Mar. 31, 2009).

18.    To participate in HAMP, servicers enter into a contract ("HAMP Contract") with Fannie Mae, in its capacity as an agent of the United States. *See* Emergency Economic Stabilization Act of 2008 § 101(c)(3). The HAMP Contract incorporates by reference documents issued by Treasury and designated in the HAMP Contract as "Program Documentation." These documents include uniform "Home Affordable Modification Program Guidelines" for modifying loans under HAMP ("Guidelines"), subsequent Supplemental Directives, and "Frequently Asked Questions" ("FAQs") intended to further clarify HAMP program requirements.

19.    Once a servicer has elected to participate in HAMP, it must review all mortgage loans in default that it services, under uniform guidelines set out in the HAMP Contract (and additional directives and documentation that the Contract incorporates by reference, HAMP Contract § 1(A) at 2) to determine if the loans can be made affordable. Servicers must perform these analyses whether the loans are held by the servicer itself or if they are merely servicing the mortgage held by another lender or investor.

20.    A servicer's obligations under the HAMP Contract are clear. First, it must make a threshold determination of whether the borrower meets minimum eligibility criteria for the program:

  • The borrower's mortgage is a first lien originated before January 1, 2009;
  • The mortgage has not been previously modified under HAMP;

- The borrower has defaulted (*i.e.*, is 60 days or more delinquent) or default is reasonably foreseeable;

- The mortgage is secured by a one- to four-unit property, one unit of which is the borrower's principal residence, and the property is not vacant or condemned;

- The borrower's monthly payments toward principal, interest, taxes, insurance, and association fees (where applicable) exceed 31 percent of his or her gross monthly income;

- The borrower has experienced financial hardship, and lacks the liquid assets to meet his or her monthly mortgage payments; and

- For single-family residential properties, the unpaid principal balance on the mortgage is less than or equal to $729,750.

21.   If the borrower meets these basic eligibility criteria, the servicer is required to conduct a "net present value" ("NPV") test.  The test requires the servicer to take a series of steps, such as reducing the interest rate and extending the term of the loan, to adjust the borrower's monthly loan payments to be no more than 31% of the borrower's gross monthly income.  The NPV analysis then compares the net present value of cash flow from these modified loan terms to the net present value of the loan without modification – in other words, whether the loan as modified would yield a better financial outcome to the investor than foreclosure.

22.   A servicer must send a "Borrower Notice" to every borrower who (1) has been evaluated for HAMP but is not offered a Trial Period Plan, (2) is not offered an official HAMP modification, or (3) is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. The written notices must comply with all laws, rules and regulations, including the Equal Credit Opportunity Act, when applicable to the transaction. *See* Making Home Affordable Modification Program, Supplemental Directive No. 09-08, at 1 (Nov. 3, 2009).

23.     When a borrower is not approved for a HAMP modification because the transaction is NPV negative, the notice must, in addition to an explanation of NPV, include a list of certain input fields that are considered in the NPV decision, and a statement that the borrower may, within 30 calendar days of the date of the notice, request the date the NPV calculation was completed and the values used to populate the NPV input fields.  The purpose of providing this information is to allow the borrower the opportunity to correct values that may impact the analysis of the borrower's eligibility.

24.     If a borrower is denied a modification because the borrower's income does not meet the 31% monthly mortgage ratio, the servicer can lower the interest rate to as low as 2% and extend the term of the loan to up to 40 years to insure that the borrower can meet the requirement of only paying 31 percent of their gross monthly earnings towards the modified loan.  The servicer may also provide for principal forbearance to achieve the target monthly mortgage payment ratio. Making Home Affordable Program; Handbook for Servicers of Non-GSE Mortgages, section 6.3, Version 3.2, June 1, 2011.  *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_32. pdf.

25.     In 2008, J.P. Morgan Chase accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  On July 31, 2009, Chase entered into a HAMP Contract known as a Servicer Participation Agreement ("SPA") to participate in the HAMP program. The SPA was amended in March 2010.  This contract obligates Chase to perform actions to benefit homeowners whose mortgage loans its services. *available at* http://www.treasury.gov/initiatives/financial-stability/housingprograms/mha/Documents_Contracts_Agreements/093010jpmorga nchasebanknaSPA.

26.     In April 2011, Treasury reported that Chase's performance under HAMP is lacking in terms of homeowner evaluation and assistance.  Treasury found that Chase incorrectly evaluated homeowner's eligibility for Making Home Affordable ("MHA") programs, failed to communicate decisions in a timely manner, and failed to accurately execute MHA activities, including correctly evaluating homeowner's monthly income for HAMP eligibility.  Because of these failures, Treasury suspended Chase's incentive payments.  April 2011 Making Home Affordable Program Report and Servicer Assessments for First Quarter 2010, *available at* http://www.treasury.gov/initiatives/financial-stability/results/MHA-Reports.

**B.     Plaintiffs' HAMP Applications and Defendant Chase's Contradictory and Unreasonably Delayed Responses**

27.     Mr. and Mrs. Watts purchased the property located at16890 Cabernet Court in Morgan Hill, California, on April 12, 2004.  It is a single-family home and has been, at all relevant times described in this Complaint, their principal place of residence.

28.     On or around March 26, 2004, the Watts family obtained a loan in the amount of $676,800 from Chase's predecessor in interest Washington Mutual.

29.     In 2010, the Watts family had a total monthly payment of $4470.48 on the home loan.  This amount covered principal, interest, and an impound account for property taxes and homeowner's insurance.

30.     On or around the beginning of February 2009, Mr. Watts was laid off from his employment.  After he was laid off from work, Mr. Watts's disability worsened.  Mr. Watts was approved for State Disability Income in November 2009.

31.     Because their financial situation had changed, putting them at imminent risk of defaulting on their mortgage obligation, the Watts family applied for a HAMP modification on or around October 6, 2009.

32.     On our around January 27, 2010, Mr. Watts called Chase to check the status of their application. The Chase representative told him that the Wattses did not qualify for a HAMP modification because they had too many assets to qualify for a modification. The Chase representative further told Mr. Watts that their application was removed from the system on December 16, 2009, because they allegedly had cash reserves sufficient to cover six months of their mortgage-related expenses.

33.     However, at the time cited by the Chase representative, the Watts family actually had cash reserves sufficient to cover only two months of their mortgage-related expenses, which are not excessive reserves for HAMP eligibility purposes. Making Home Affordable Program: Handbook for Servicers of Non-GSE Mortgages, Section 4.1, Version 3.2, June 1, 2011.

34.     The Watts family did not receive a written denial from Chase citing this as a reason for the denial of their application, nor did they receive written notification that their HAMP application was removed from Chase's system.

35.     The Watts family reapplied for a HAMP modification on February 5, 2010. They submitted all of the requested documents to Chase in a timely manner. On February 13, 2010, the Watts family received a letter from Chase notifying them that their application was under review; the letter also confusingly stated that they should continue to make their trial period payments on time even though the Watts family had not entered into a Trial Period Payment agreement with Chase. At this time, they were current with their mortgage payments.

36.     On May 28, 2010, nearly four months after submitting their second HAMP application, the Watts family received a letter from Chase dated May 28, 2010, advising them that their application for a HAMP modification was denied because Chase could not verify that the Watts family lived in the property as their primary residence.

37.     In response to the May 28, 2010, letter from Chase, the Watts family sent Chase a copy of the HUD 1 Settlement Statement showing that they had sold their previous home before purchasing the Cabernet Court property in 2004.

38.     During a conversation with a Chase representative in June 2010, the Watts family was told that it was Chase's policy to not consider borrowers for HAMP unless the borrower was in default. They had never missed a mortgage payment before and were applying for a HAMP modification because they were concerned about defaulting on their loan. Their financial situation had changed dramatically and the Watts family was facing imminent default.

39.     In July 2010, while the Watts family was in the processing of providing Chase with additional information to show that the Cabernet Court property was their only residence, they were informed by Chase that their application had been removed from Chase's system and that if the Watts family remained interested in a modification they would have to reapply.

40.     The Watts family submitted a third HAMP application on or around August 9, 2010. At that time, the Watts family also included copies of their drivers licenses and their most recent utility bill because they were worried that they would be denied again based on Chase's inability to verify that the Morgan Hill home was their primary residence.

41.     During August and September 2010, the Watts family consistently contacted Chase regarding their HAMP application, submitting updated pay stubs and account information. During a conversation with a Chase representative in September 2010, the Watts family was told that they could submit Mr. Watts' State Disability Income but that the representative "didn't think that Chase's underwriting is going to include disability payments as income."

42.     On October 26, 2010, the Watts family received a letter from Chase denying them a HAMP modification because Chase was "unable to create an

affordable payment equal to 31% of [their] reported monthly gross income without changing the terms of the loan beyond the requirements of the Program."

43.    The Watts family believed the reason for denial to be inaccurate, and on November 13, 2010, sent a letter to Chase asking that Chase reevaluate them for HAMP or, alternatively, that Chase provide them with documentation showing why they were denied the modification. The Watts family did not receive a response to this letter from Chase.

44.    The Watts family sent another letter to Chase on January 7, 2011, once again requesting to be reevaluated for the HAMP program and, if not, requesting that Chase provide them with a specific reason for the denial.

45.    The Watts family never received a response from Chase regarding their letters dated November 13, 2010, and January 7, 2011.

46.    On January 19, 2011, U.S. Bank National Association recorded an Assignment of the Deed of Trust.

47.    On January 19, 2011, a Notice of Default was recorded against the Watts family's property. A Notice of Trustee Sale was recorded on April 20, 2011. The Watts family is now in jeopardy of losing their family home without ever having been properly evaluated for a HAMP modification due to Defendants' discriminatory acts.

## VI.    INJURIES

48.    The impending foreclosure as a result of Defendants' failure to properly follow ECOA and failure to consider Mr. Watts's State Disability Income in evaluating the Wattses for a HAMP modification has caused great hardship and distress to Plaintiffs.

49.    Defendants have failed to adequately train and supervise their employees, agents, and themselves regarding the federal credit discrimination law and state fair housing law.

50.     Defendants, acting individually and in concert with others, directly and through agents, have engaged in a pattern or practice of discrimination based on source of income.  Defendants continue to engage in such a pattern or practice of discrimination so as to constitute a continuing violation.

51.     By reason of Defendants' unlawful acts and practices, the Watts family has suffered humiliation, mental anguish, and emotional distress, and the attendant physical injuries and conditions, as well as violation of their civil rights. Accordingly, the Watts family is entitled to compensatory damages.

52.     Defendants acted intentionally, maliciously, wantonly, recklessly, and in bad faith as described herein.  Accordingly, the Watts family is entitled to punitive damages.

53.     There now exists an actual controversy between the parties regarding Defendants' duties under the ECOA and FEHA.  Accordingly, the Watts family is entitled to declaratory relief.

54.     Unless enjoined, Defendants will continue to engage in the unlawful acts and discrimination described above.  The Watts family has no adequate remedy at law.  The Watts family is now suffering and will continue to suffer irreparable injury from Defendants' acts and their discrimination unless relief is provided by this Court.  Accordingly, the Watts family is entitled to injunctive relief.

## VII.   CLAIMS

### FIRST CAUSE OF ACTION
**Violations of the Federal Equal Credit Opportunity Act – 15 U.S.C. § 1691(d)**
**(Against Defendants JP Morgan Chase Bank, N.A. and Chase Home Finance, LLC)**

55.     Mr. and Mrs. Watts hereby reallege and incorporate by reference the allegations of paragraphs 1 through 54 as though fully set forth herein.

56.     The Watts family are applicants as defined by ECOA, 15 U.S.C. § 1691a(b).  The Watts family applied for HAMP modifications with the Chase Defendants on three separate occasions.

57.   At all relevant times herein, the Chase Defendants have been "creditors" as defined by ECOA, 15 U.S.C. § 1691a(e).

58.   15 U.S.C. § 1691(d)(1) provides that "within thirty days…after receipt of a completed application for credit, a creditor shall notify an applicant of its actions on the application."

59.   15 U.S.C. § 1691(d)(2) provides that "each applicant against whom a adverse action is taken shall be entitled to a statement of reasons for such action from the creditor."

60.   15 U.S.C. § 1691(d)(6) defines "adverse action" as a "denial or revocation of credit, a change in the terms of an existing credit arrangement or refusal to grant credit in substantially the same amount or on substantially the terms requested."

61.   Plaintiffs' applications for HAMP modifications were "applications for credit" as defined by 15 U.S.C. § 1691a(d) and 12 C.F.R. § 202.2(j).

62.   Plaintiffs provided the Chase Defendants with completed applications for credit on October 6, 2009, February 5, 2010, and September 27, 2010.

63.   The Chase Defendants failed to evaluate and make a determination on Plaintiffs' three separate applications within 30 calendar days as required by HAMP directives and ECOA.

64.   When Plaintiffs finally received written denials from the Chase Defendant on May 28, 2010, and again on October 26, 2010, these written notifications were not in compliance with the notification requirements set forth in 15 U.S.C. § 1691(d)(2), as the notifications failed to provide Plaintiffs with specific statements of reasons for the adverse action.

65.   The Chase Defendants failed to respond to Plaintiffs' written requests for a statement of reasons for the denial within 30 days of the Plaintiffs' letters to the Chase Defendants dated November 13, 2010, and January 7, 2011.

66.     Plaintiffs never received a written denial from the Chase Defendants in response to their first application for credit in October 2009. Plaintiffs were only notified that this application was denied when they called to check the status of the application in January 2010.

67.     The Chase Defendants' failure to (1) notify Plaintiffs of the adverse action taken on their three applications for credit within 30 days from receipt of their completed applications and (2) respond to Plaintiffs' written requests for the statement of reasons for their denial constitutes four separate substantive violations of ECOA.

68.     As a result of the above ECOA violations, the Chase Defendants are liable to Plaintiffs for actual damages pursuant to 15 U.S.C. § 1691e(a); punitive damages of $10,000 pursuant to 15 U.S.C. § 1691e(b); and attorneys fees and costs pursuant to 15 U.S.C. § 1691e(d).

69.     Plaintiffs are entitled to equitable relief against the Chase Defendants requiring delivery of ECOA-compliant notices in all future instances pursuant to 15 U.S.C. § 1691e(c).

## SECOND CAUSE OF ACTION
**Violation of California Fair Employment and Housing Act – Cal. Gov't Code § 12955 et seq.**
**(Against Defendant JP Morgan Chase Bank, N.A. and Chase Home Finance, LLC)**

70.     Mr. and Mrs. Watts hereby reallege and incorporate by reference the allegations of paragraphs 1 through 69 as though fully set forth herein.

71.     The Chase Defendants injured Plaintiffs in violation of the California Fair Employment and Housing Act by committing the following discriminatory housing practices:

A.     Discriminating because of source of income, in violation of California Government Code §§ 12955(e) and (i);

B.     Making statements that indicate a preference, limitation or

discrimination based on source of income in the provision of services in connection with a residential real estate related transaction, in violation of California Government Code § 12955(c);

        C. Otherwise denying or making unavailable the provision of services in connection with a residential real estate related transaction or in the terms, conditions, or privileges relating to the obtaining or use of that financial assistance because of source of income, in violation of California Government Code § 12955(i); and

        D. Imposing policies that have a negative, disproportionate effect on individuals with State Disability Insurance, in violation of California Government Code § 12955.8(b).

72. As a proximate cause of the Chase Defendants' conduct, Plaintiffs were and continue to be damaged, as set forth above, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Violations of California Business & Professions Code § 17200
### (Against all Defendants)

73. Mr. and Mrs. Watts hereby reallege and incorporate by reference the allegations of paragraphs 1 through 72 as though fully set forth herein.

74. California Business & Professions Code § 17200, et seq., the "Unfair Competition Law" ("the UCL") defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice. The UCL authorizes this Court to issue whatever orders or judgments may be necessary to prevent unfair or unlawful practices, or to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.* § 17203.

75. Defendants' acts and practices alleged herein are unlawful business practices in that they violate federal and state law prohibiting discrimination and wrongful foreclosure, as alleged in this Complaint.

76.     Moreover, Defendants' initiation of the foreclosure process without ever genuinely evaluating the Watts family for a HAMP loan modification violates California law that requires lenders to assess the borrower's financial situation and explore options for avoiding foreclosure before foreclosing on the property, Cal. Civil Code §§ 2923.5 and 2923.6.

77.     Defendants' acts and practices challenged alleged herein also constitute unfair business practices.   Defendants' refusal to investigate the Watts family's requests for case escalation, their refusal to postpone foreclosing on the Watts family pending meaningful determination of their HAMP eligibility, and other acts described in this Complaint offend public policy with regard to the above statutes and regulations.  Moreover, Defendants' acts in proceeding with foreclosure before genuinely evaluating the Watts family for a loan modification offends public policy strongly favoring modification as provided in the federal Home Affordable Modification Program and Cal. Civil Code §§ 2923.5 and 2923.6.  All of these acts and practices are substantially injurious to consumers and have no utility that outweighs their substantial harm to consumers.

78.     The Court's intervention is necessary to halt and remedy Defendants' unlawful and unfair acts and practices.

79.     Pursuant to Business and Professions Code § 17203, the Court should issue an Order preliminary and permanently restraining Defendants and their agents, servants, employees, representatives, and anyone acting on their behalf or direction from engaging in, committing, permitting, or performing, directly or indirectly, any of the unfair, unlawful or deceptive business practices described herein, and awarding restitution; disgorgement of sums wrongfully obtained; and costs of suit.

## VIII.  RELIEF

WHEREFORE, the Watts family prays for judgment against Defendants as follows:

1.     That the Court assume supplemental jurisdiction over all state law claims, pursuant to 28 U.S.C. § 1367;

2     For equitable relief, including an Order compelling Defendants to properly evaluate the Watts family for a HAMP modification;

3     For injunctive relief against Defendants to prevent future wrongful conduct;

4.     For general, compensatory damages, and punitive damages according to proof;

5.     For statutory damages according to proof;

6.     For an award of attorneys fees, litigation expenses, and costs of suit;

7.     For such other and further relief as the Court may deem proper.


July 15, 2011                       Respectfully submitted,

                                    FAIR HOUSING LAW PROJECT


                                    /s/
                                    Annette D. Kirkham
                                    Attorneys for Plaintiffs

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury as to each and every claim for which they are so entitled.

Dated: July 15, 2011                        Respectfully submitted,

                                            FAIR HOUSING LAW PROJECT


                                            _____/s/_____
                                            Annette D. Kirkham
                                            Attorneys for Plaintiffs

1

2

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

3   Pursuant to Local Rule 3-16, the undersigned certifies that as of this date,

4   other than the named parties, there is no such interest to report.

5

Dated: July 15, 2011                    Respectfully submitted,

6

7                                          FAIR HOUSING LAW PROJECT

8

9                                          _____/s/_____

Annette D. Kirkham

10                                         Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28